## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

HAYWOOD EDOUARD,
    Petitioner,

v.                       Case No. 8:23-cv-11-KKM-AAS

SECRETARY, DEPARTMENT
OF CORRECTIONS,
    Respondent.
_____

### <u>ORDER</u>

Haywood Edouard, a Florida prisoner, timely[1] filed a pro se Petition

for Writ of Habeas Corpus under 28 U.S.C. § 2254, challenging his state-

court convictions for second-degree felony murder and attempted

---

[1] A state prisoner has one year from the date his judgment becomes final to file a § 2254 petition. *See* 28 U.S.C. § 2244(d)(1). This one-year limitation period is tolled during the pendency of a properly filed state motion seeking collateral relief. *See id.* § 2244(d)(2). The appellate court affirmed Edouard's convictions on June 14, 2015. (Doc. 12-2, Ex. 17.) His judgment became final 90 days later, on September 14, 2015, when the time to petition the Supreme Court of the United States for a writ of certiorari expired. *See Bond v. Moore*, 309 F.3d 770, 774 (11th Cir. 2002). After 349 days of untolled time, on August 29, 2016, Edouard filed a motion to correct sentencing error under Florida Rule of Criminal Procedure 3.800(a). (Doc. 12-2, Ex. 21.) The motion remained pending until July 14, 2017, when the time to appeal its denial expired. (*Id.*, Exs. 22, 24.) The limitation period resumed the next day. After two days of untolled time, on July 17, 2017, Edouard filed a petition alleging ineffective assistance of appellate counsel. (*Id.*, Ex. 26.) The petition was denied on August 15, 2017, but the clock did not restart at that point because, on July 24, 2017, Edouard had moved for postconviction relief under Rule 3.850. (*Id.*, Exs. 27–28.) The Rule 3.850 motion remained pending until December 12, 2022, when the appellate mandate issued. (*Id.*, Ex. 43.) The clock resumed the next day, leaving Edouard 14 days—or until December 27, 2022—to seek federal habeas relief. He met the deadline, filing his petition on December 13, 2022. (Doc. 1 at 1.) Therefore, the petition is timely.

1

robbery. (Doc. 1.) Having considered the petition, (*id*.), the response in opposition, (Doc. 12), and the reply, (Doc. 16), the petition is denied. Because reasonable jurists would not disagree, a certificate of appealability also is not warranted.

## I.  <u>BACKGROUND</u>

On the evening of August 5, 2012, Edouard participated in an attempted robbery that led to the death of Ernest Curry, one of his accomplices. Earlier that evening, Curry had driven to Robert Harrell's house to purchase $40 worth of marijuana. (Doc. 12-2, Ex. 7, at 405–06.) The sale took place without incident. (*Id.* at 406.) Sometime later, Curry called Harrell and asked to buy a larger quantity of marijuana. (*Id.* at 406–07.) This time, Curry drove to the house with Edouard and a third man whose identity remains unknown. (*Id.* at 408, 412.)

Harrell became concerned when he saw that Curry had backed the car into the driveway. (*Id.* at 412.) He grabbed the marijuana, armed himself with a pistol, and walked to the driver's side window. (*Id.* at 409–10, 413.) Curry told Harrell to "come around to the other side of the car." (*Id.* at 413.) Harrell complied. (*Id.* at 415.) When he looked inside the car, Harrell saw Edouard in the back wearing an "all-white hoodie" and

holding a gun. (*Id.* at 415–16.) Harrell tried to run back to the house, but he tripped on the driveway. (*Id.* at 416–18.) When he looked up, he was surrounded by Edouard, Curry, and the third robber. (*Id.* at 418.) Edouard and the third robber wore masks and gloves; they also had guns. (*Id.* at 419, 452.)

The three men led Harrell to the front door. (*Id.* at 421.) Curry tried to open the door, but Harrell "bump[ed] into [it] and close[d] it." (*Id.* at 422.) The third robber hit Harrell in the mouth. (*Id.* at 422–23.) Harrell then grabbed Edouard's arm to "take control of the gun." (*Id.* at 426–27.) During the ensuing struggle, the gun fired once or twice in Curry's direction. (*Id.* at 427.) A wounded Curry fled the scene with the third robber. (*Id.* at 428.) They stole a car from a nearby house and drove away. (*Id.* at 288–30, 580–81.) Meanwhile, Edouard broke free from Harrell and ran toward the car on the driveway. (*Id.* at 428.) Harrell pulled out his gun and emptied the clip in Edouard's direction, shooting him in the collarbone. (*Id.* at 331, 429.) Edouard "stumbled" into the car and drove away. (*Id.* at 431.)

Edouard and Curry separately drove to the house of Yolanda Thompson, Edouard's aunt. (*Id.* at 304, 360, 378–79.) Thompson took

both men to the hospital. (*Id.*, Ex. 8, at 4.) Curry died of his injuries; Edouard survived. (*Id.*, Ex. 7, at 560.) Law enforcement spoke to Edouard at the hospital. (*Id.*, Ex. 8.) He claimed that he and a man named "Terry" were shot while "walking," and that they "ran" to Thompson's house after the incident. (*Id.* at 3–4.)

Law enforcement found the robbers' cars parked outside Thompson's house. (*Id.*, Ex. 7, at 378.) Curry had left DNA on the steering wheel of the stolen car; Edouard had left DNA on the driver's seat of the other car. (*Id.* at 581, 594.) Law enforcement also recovered gloves and a bloody white hoodie from trash cans outside Thompson's house. (*Id.* at 333–35.) Edouard had left DNA on both the gloves and the hoodie. (*Id.* at 588–92, 595–98.)

Edouard was charged for his role in Curry's death and the attempted robbery. (*Id.*, Ex. 3.) The case went to trial. The jury found Edouard guilty of second-degree felony murder and attempted robbery.[2] (*Id.*, Ex. 9.) He received a total sentence of 25 years' imprisonment. (*Id.*, Ex. 10.) After the convictions were affirmed on direct appeal, Edouard

---

[2] Second-degree felony murder occurs "when a person is killed in the perpetration of an offense by a person other than the perpetrator." *Philippe v. State*, 795 So. 2d 173, 174 (Fla. 3d DCA 2001).

unsuccessfully pursued various forms of postconviction relief in state court. (*Id.*, Exs. 21–43.) This federal habeas petition followed. (Doc. 1.)

## II. <u>STANDARD OF REVIEW UNDER SECTION 2254</u>

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) governs this proceeding. *Carroll v. Sec'y, DOC*, 574 F.3d 1354, 1364 (11th Cir. 2009). Habeas relief under the AEDPA can be granted only if a petitioner is in custody "in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). "The power of the federal courts to grant a writ of habeas corpus setting aside a state prisoner's conviction on a claim that his conviction was obtained in violation of the United States Constitution is strictly circumscribed." *Green v. Sec'y, Dep't of Corr.*, 28 F.4th 1089, 1093 (11th Cir. 2022).

Section 2254(d) provides that federal habeas relief cannot be granted on a claim adjudicated on the merits in state court unless the state court's adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

For purposes of § 2254(d)(1), the phrase "clearly established Federal law" encompasses the holdings only of the United States Supreme Court "as of the time of the relevant state-court decision." *Williams v. Taylor*, 529 U.S. 362, 412 (2000). This section "defines two categories of cases in which a state prisoner may obtain federal habeas relief with respect to a claim adjudicated on the merits in state court." *Id.* at 404. First, a decision is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Id.* at 413.

Second, a decision involves an "unreasonable application" of clearly established federal law "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* The AEDPA was meant "to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693 (2002). Accordingly, "[t]he focus . . . is on whether the state court's application of clearly established federal law is

objectively unreasonable, and . . . an unreasonable application is different from an incorrect one." *Id.* at 694. As a result, to obtain relief under the AEDPA, "a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011); *see also Lockyer v. Andrade*, 538 U.S. 63, 75 (2003) (stating that "[t]he state court's application of clearly established federal law must be objectively unreasonable" for a federal habeas petitioner to prevail and that the state court's "clear error" is insufficient).

When the last state court to decide a federal claim explains its decision in a reasoned opinion, a federal habeas court reviews the specific reasons as stated in the opinion and defers to those reasons if they are reasonable. *Wilson v. Sellers*, 584 U.S. 122, 125 (2018). But the habeas court is "not limited by the particular justifications the state court provided for its reasons, and [it] may consider additional rationales that support the state court's determination." *Jennings v. Secretary, Fla. Dep't of Corr.*, 55 F.4th 1277, 1292 (11th Cir. 2022). When the relevant state-

7

court decision is not accompanied with reasons for the decision—such as a summary affirmance without discussion—the federal court "should 'look through' the unexplained decision to the last related state-court decision that does provide a relevant rationale [and] presume that the unexplained decision adopted the same reasoning." *Wilson*, 584 U.S. at 125. The state may "rebut the presumption by showing that the unexplained affirmance relied or most likely did rely on different grounds than the lower state court's decision." *Id.*

For purposes of § 2254(d)(2), "it is not enough to show that 'reasonable minds reviewing the record might disagree about the finding in question.'" *Brown v. Davenport*, 142 S. Ct. 1510, 1525 (2022) (quotations omitted). "An unreasonable determination of the facts occurs when the direction of the evidence, viewed cumulatively, was too powerful to conclude anything but the petitioners factual claim." *Teasley v. Warden, Macon State Prison*, 978 F.3d 1349, 1355 (11th Cir. 2020) (internal quotation marks and alterations omitted). A state court's findings of fact are presumed correct, and a petitioner can rebut the presumption of correctness afforded to a state court's factual findings only by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

8

Even where a petitioner succeeds in rebutting the presumption, he must show that the state court's decision is "based on" the incorrect factual determination. *Pye v. Warden, Ga. Diagnostic Prison*, 50 F.4th 1025, 1035 (11th Cir. 2022). This is because a state court decision may still be reasonable "even if some of the state court's individual factual findings were erroneous—so long as the decision, taken as a whole, doesn't constitute an 'unreasonable determination of the facts' and isn't 'based on' any such determination." *Id*. (quoting *Hayes v. Sec'y, Fla. Dep't of Corr.*, 10 F.4th 1203, 1224–25 (11th Cir. 2021) (Newsom, J., concurring)).

## III.  <u>INEFFECTIVE ASSISTANCE OF COUNSEL</u>

Edouard alleges ineffective assistance of counsel under the Sixth Amendment. Under the well-known, two-part standard articulated in *Strickland v. Washington*, 466 U.S. 668 (1984), to succeed, he must show both deficient performance by his counsel and prejudice resulting from those errors. *Id*. at 687.

The first part "requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* The lynchpin of this analysis is

9

whether counsel's conduct "was reasonable considering all the circumstances." *Id*. at 688. A petitioner establishes deficient performance if "the identified acts or omissions [of counsel] were outside the wide range of professionally competent assistance." *Id*. at 690. A court "must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Id*. "[C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id*.

The second part requires showing that the deficient performance prejudiced the defense. *Id*. at 687. "An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Id*. at 691. To demonstrate prejudice, a petitioner must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*. at 694.

"The question [on federal habeas review of an ineffective assistance claim] 'is not whether a federal court believes the state court's

10

determination' under the *Strickland* standard 'was incorrect but whether that determination was unreasonable—a substantially higher threshold.'" *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009) (quoting *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007)). Consequently, federal petitioners rarely prevail on claims of ineffective assistance of counsel because "[t]he standards created by *Strickland* and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so." *Richter*, 562 U.S. at 105 (quotation and citations omitted).

## IV.  <u>ANALYSIS</u>

### A. Ground One—Denial of Motion to Suppress

Edouard argues that the trial court erred in denying his motion to suppress a buccal swab taken from him at the hospital. (Doc. 1 at 3.) According to Edouard, law enforcement violated the Fourth Amendment by taking the swab "without [his] verbal or written consent." (*Id.*) The court held an evidentiary hearing on this motion. (Doc. 12-2, Ex. 5.) Three law enforcement witnesses testified. (*Id.*) After the hearing, the court entered a written order finding that the "taking of the buccal swab was . . . permissible in light of [Edouard's] voluntary consent." (*Id.*, Ex. 6, at 2.) The court explained that a detective "asked [Edouard] for permission to

take a buccal swab from him for DNA testing," whereupon Edouard "gave permission." (*Id.* at 1.) Edouard challenged this ruling on direct appeal, and the appellate court rejected his argument without explanation. (*Id.*, Ex. 15, at 30-33; *id.*, Ex. 17.)

Edouard's Fourth Amendment claim is not cognizable on federal habeas review. "[W]here the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, a state prisoner may not be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial." *Stone v. Powell*, 428 U.S. 465, 494 (1976). An opportunity for "full and fair" litigation "includes at least one evidentiary hearing in a trial court and the availability of meaningful appellate review when there are facts in dispute." *Lawhorn v. Allen*, 519 F.3d 1272, 1287 (11th Cir. 2008). Edouard received that opportunity, litigating his suppression motion at an evidentiary hearing and challenging its denial on appeal. Thus, *Stone* precludes federal habeas review of his Fourth Amendment claim.

Edouard appears to contend that *Stone* does not apply because the denial of his motion to suppress rested on "an unreasonable determination of the facts." (Doc. 16 at 3.) But the *Stone* bar "still applies

12

despite a state court error in deciding the merits of a defendant's [F]ourth [A]mendment claim." *Williams v. Brown*, 609 F.2d 216, 220 (5th Cir. 1980) (citing *Swicegood v. Alabama*, 577 F.2d 1322, 1324–25 (5th Cir. 1978)). Indeed, if "full and fair" opportunity "means that the state courts must correctly apply federal constitutional law" and correctly find the facts, "*Stone* becomes a nullity." *Swicegood*, 577 F.2d at 1324.

## B. Ground Two—Alleged Confrontation Clause Violations

Edouard argues that the trial court violated the Confrontation Clause by "improperly limit[ing]" his cross-examination of Harrell, the victim of the attempted robbery. (Doc. 1 at 4.) This claim concerns counsel's attempt to cross-examine Harrell on two topics—his interview with law enforcement and his probation violations. (*Id.*; Doc. 12-2, Ex. 15, at 12–29.) I consider each in turn.

***Interview with Law Enforcement.*** Harrell spoke to law enforcement two days after the incident. (Doc. 12-2, Ex. 7, at 437.) He described the attempted robbery and the shooting, but he denied "selling marijuana" or possessing a gun. (*Id.* at 437–38, 481–82.) Approximately thirty minutes into the interview, the detectives turned off the tape recorder and urged Harrell to "be[] honest." (*Id.* at 322.) When the

13

recording resumed, Harrell gave the version of events recounted above, which he described at trial as "the truth." (*Id.* at 496.)

During cross-examination of Harrell, counsel explored the unrecorded portion of the interview. (*Id.* at 497.) Counsel asked whether the detectives were "telling you that you could be charged with some serious crimes unless you were straight with them." (*Id.*) Harrell said, "No, they didn't tell me that." (*Id.*) Counsel then pointed out that, "right before the tape went off," one of the detectives said that a defense attorney could "turn[] around on you" and say that Harrell "was trying to rob" Edouard and his accomplices. (*Id.*) The prosecution objected to the "form of impeachment," arguing that "[t]here [was] no statement by the detective saying he's threatening [Harrell] with charges." (*Id.*) Counsel responded that "this [went] to [Harrell's] state of mind" during the interview. (*Id.*) The court sustained the objection. (*Id.* at 498.)

According to Edouard, the court violated the Confrontation Clause by "precluding defense counsel from cross-examination as to . . . Harrell's state of mind in giving contradict[ory] statements" to law enforcement. (*Id.*, Ex. 15, at 20.) In Edouard's view, Harrell "changed his story" because he was afraid that law enforcement would charge him with

"second-degree murder or a multitude of other offenses." (*Id.* at 27.) Cross-examination on this issue was allegedly "essential to [evaluating Harrell's] credibility." (*Id.*)

The appellate court rejected Edouard's Confrontation Clause claim in an unexplained decision. (*Id.*, Ex. 17.) Thus, Edouard must show that "there was no reasonable basis for the state court to deny relief." *Richter*, 562 U.S. at 98; *see also Tarleton v. Sec'y, Fla. Dep't of Corr.*, 5 F.4th 1278, 1291 (11th Cir. 2021) ("[Petitioner's] Confrontation Clause claim was rejected on the merits by the First District Court of Appeal, and there has been no statement of reasons by any state court for rejecting the claim. Under *Richter*, [petitioner's] burden is to demonstrate that there was no reasonable basis for the decision of the First District Court of Appeal to deny his claim.").

Edouard cannot meet his burden.[3] The Confrontation Clause requires "a full and fair opportunity to probe and expose . . . infirmities

---

[3] Respondent argues that Ground Two is procedurally defaulted, but I need not reach that issue because the claim fails on the merits. *See Parker v. Head*, 244 F.3d 831, 838 (11th Cir. 2001) (finding it "unnecessary to decide whether or not [petitioner's] Sixth Amendment claim was procedurally defaulted" because, even if it "was not procedurally barred, we cannot say that the [state court's] rejection of [the] claim was contrary to, or an unreasonable application of, clearly established Supreme Court precedent").

through cross-examination, thereby calling to the attention of the factfinder the reasons for giving scant weight to the witness's testimony." *Delaware v. Fensterer*, 474 U.S. 15, 22 (1985). But the Clause guarantees only "an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *Id.* at 20. "[T]rial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on [] cross-examination based on concerns about . . . harassment, prejudice, confusion of the issues, the witness's safety, or interrogation that is repetitive or only marginally relevant." *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986). "A defendant's confrontation rights are satisfied when the cross-examination permitted exposes the jury to facts sufficient to evaluate the credibility of the witnesses and enables defense counsel to establish a record from which he can properly argue why the witness is less than reliable." *Mills v. Singletary*, 161 F.3d 1273, 1288 (11th Cir. 1998).

A reasonable jurist could find that the trial court did not violate the Confrontation Clause. According to Edouard, counsel was precluded from establishing Harrell's "state of mind" during the interview. (Doc. 12-2,

Ex. 15, at 27.) Edouard posits that Harrell fabricated a "robbery gone wrong" out of fear that law enforcement would charge him with "second-degree murder or a multitude of other offenses." (*Id*.) But counsel explored this topic in depth when he cross-examined Harrell. As noted above, counsel asked Harrell whether the detectives were "telling you that you could be charged with some serious crimes unless you were straight with them." (*Id*., Ex. 7, at 497.) Harrell said no. (*Id*.) Counsel later asked whether Harrell was "worried about potentially being charged with a homicide." (*Id*. at 522–23.) Again, he said he "wasn't." (*Id*. at 523.) Counsel then got Harrell to admit that when he spoke to law enforcement, he knew Curry "was dead." (*Id*.) Counsel pressed on, asking Harrell one more time whether "the detectives told you, hey, you either get straight with us or we're going to charge you with a murder." (*Id*. at 524.) Once again, Harrell said "they never did." (*Id*.)

On this record, a reasonable jurist could conclude that counsel "had ample opportunity to cross-examine" Harrell about his state of mind during the interview. *United States v. Orr*, 825 F.2d 1537, 1540 (11th Cir. 1987). Harrell may not have given the answers counsel wanted, but the Confrontation Clause guarantees only "an *opportunity* for effective cross-

examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *Fensterer*, 474 U.S. at 20. Indeed, any further questioning on Harrell's state of mind would have been "repetitive"—and thus subject to limitation by the court. *Van Arsdall*, 475 U.S. at 679; *see also Mills*, 161 F.3d at 1288 ("Once a defendant has engaged in sufficient cross-examination to satisfy the Confrontation Clause, further questioning is within the trial court's discretion."). In short, a reasonable jurist could find that counsel was not "deprived of the opportunity to fully cross-examine" Harrell on his motive to fabricate during the interview. *Dorsey v. Chapman*, 262 F.3d 1181, 1188 (11th Cir. 2001).

*Probation Violations*. The jury learned that, after speaking with law enforcement, Harrell received a probationary sentence for "possession" and "distribution" of narcotics as well as "possession of a firearm with an altered serial number." (Doc. 12-2, Ex. 7, at 452–53, 458.) Harrell also acknowledged that four months before trial, he pleaded guilty to additional offenses—possession of marijuana and cocaine—for which he received a sentence of time served and an "extra" 24 months of probation. (*Id.* at 530, 532.) The jury heard that this sentence was

18

significantly lower than the statutory maximum of 15 years' imprisonment. (*Id.* at 532.) Harrell testified, however, that the prosecutor in Edouard's case did not "help" him resolve any of his criminal charges. (*Id.* at 453.)

Counsel sought to cross-examine Harrell about yet another probation violation that occurred before trial. (*Id.* at 525–26.) Counsel asked, "[Y]ou passed—what we lawyers in slang say you passed a hot urine [i.e., failed a drug test], didn't you?" (*Id.* at 526.) Harrell said, "That was my first urine test, but I wasn't smoking." (*Id.*) The prosecution objected that "the actual particulars [of the violation were] not relevant." (*Id.*) Counsel responded that "this [was] relevant because [Harrell] received absolutely no sanction for this. So in his mind the state [was] treating him with kid gloves throughout all this." (*Id.*) The court allowed counsel to "ask [Harrell] what was his state of mind with respect to [the] violation of probation, or what he may be looking at, et cetera." (*Id.*) But counsel could not "go[] into the details of what the violation was for, unless [he] ha[d] a basis to show that [was] somehow relevant." (*Id.*) Counsel did not ask any further questions about the positive urine test. (*Id.* at 529–34.)

Edouard contends that this ruling improperly limited his ability to "reveal [Harrell's] motive" to testify falsely. (Doc. 1 at 4; Doc. 12-2, Ex. 15, at 29.) The appellate court rejected Edouard's argument without explanation. (Doc. 12-2, Ex. 17.) Thus, Edouard must show that "there was no reasonable basis for the state court to deny relief." *Richter*, 562 U.S. at 98. He cannot do so.

A reasonable jurist could conclude that "sufficient information [was] elicited from [Harrell] from which the jury [could] adequately assess possible motive or bias." *United States v. Orisnord*, 483 F.3d 1169, 1179 (11th Cir. 2007). In Edouard's view, Harrell was favorably inclined to the state because of the "lenient" treatment he had received for his probation violations. (Doc. 12-2, Ex. 15, at 29.) Counsel "had ample opportunity to cross-examine" Harrell on this topic. *Orr*, 825 F.2d at 1540. Harrell admitted that (1) after speaking to law enforcement, he was put on probation for drug and firearm offenses, (2) four months before trial, he received a sentence of time served and an "extra" 24 months of probation for additional drug offenses, and (3) the statutory maximum for those additional offenses was 15 years' imprisonment. (Doc. 12-2, Ex. 7, at 452–53, 458, 530, 532.) In closing, counsel used this

20

testimony to argue that Harrell "[told] the state what he [thought] they want[ed] to hear" because he had received "very favorable" treatment. (*Id.* at 718–19.) Thus, "the cross-examination exposed [Harrell's alleged] motive for testifying and was sufficient to permit the jury to judge [his] credibility." *United States v. Edwards*, 211 F.3d 1355, 1359 (11th Cir. 2000). Moreover, there is no basis to conclude that the jury "would have received a significantly different impression of [Harrell's] credibility" had counsel elicited additional details about the probation violations. *United States v. Williams*, 526 F.3d 1312, 1319 (11th Cir. 2008).

## C.  Ground Three—Ineffective Assistance During Plea Negotiations

Edouard argues that trial counsel provided ineffective assistance during plea negotiations. (Doc. 1 at 5.) When counsel "approached [Edouard] with the state's 15-year plea offer," he allegedly (1) failed to inform Edouard that the statutory maximum was life imprisonment, (2) presented an "incorrect scoresheet" with a lowest permissible sentence of 13 years' imprisonment, and (3) told Edouard that "significant reasons" supported a downward departure to 10 years' imprisonment if he lost at

trial.[4] (*Id.*) Edouard says that, but for counsel's alleged misadvice, he would have accepted the 15-year offer. (*Id.*)

The postconviction court held an evidentiary hearing on this claim. (Doc. 12-2, Ex. 35.) Edouard acknowledged that counsel "[went] over" the 15-year offer with him. (*Id.* at 7–8.) During this conversation, counsel allegedly told Edouard that the lowest permissible sentence was "13 years," and that with his "minimal criminal history and the evidence showing [he] wasn't aggressive," counsel could argue for "something closer to 10 years." (*Id.* at 8.) In fact, the lowest permissible sentence was 19 years' imprisonment. (*Id.*, Ex. 22, Attachment 3.) Additionally, Edouard claimed that counsel did not discuss "how much time [he] could get if [he] rejected the 15-year offer." (*Id.*, Ex. 35, at 8.) Edouard admitted that, before sentencing, he wrote a letter to the judge saying, "I know that I lost at trial, but I still consider myself innocent. That is the main reason why I refused to accept an offer." (*Id.* at 14.)

---

[4] Under Florida law, "[t]he permissible range for sentencing shall be the lowest permissible sentence [as determined by the number of total sentencing points] up to and including the statutory maximum." *Moore v. State*, 882 So. 2d 977, 984 (Fla. 2004). "The lowest permissible sentence is the minimum sentence that may be imposed by the trial court, absent a valid reason for departure." *State v. Hall*, 47 So. 3d 361, 363 (Fla. 2d DCA 2010).

Counsel offered a different account. According to counsel, when he discussed the 15-year offer with Edouard, he explained that he faced a "[p]otential life" sentence if convicted at trial. (*Id.* at 35–36, 38.) Indeed, counsel testified that he "went over . . . the statutory maximum" in "every case [he] ever had." (*Id.* at 48.) After counsel explained the offer and the statutory maximum, Edouard said he "wished to go to trial." (*Id.* at 36.) Counsel testified that *after* the trial, he visited Edouard at the county jail to "talk[] . . . about" "mitigating factors" and "the potential sentence he was going to seek from the judge." (*Id.* at 47.) During this post-trial discussion, counsel "roughed out . . . the scoresheet" and told Edouard that he "was probably going to get somewhere between 13 years and life." (*Id.*) Counsel acknowledged that his estimate of the lowest permissible sentence contained a "math error." (*Id.*)

The court ultimately rejected Edouard's claim for lack of prejudice. (*Id.*, Ex. 37.) It was "not convinced that [Edouard] would have accepted the state's 15-year plea offer" but for counsel's alleged misadvice. (*Id.* at 4.) The court credited counsel's testimony, describing him as an "experienced and respected criminal defense attorney." (*Id.* at 3.) It found that counsel conveyed the 15-year offer to Edouard and "discussed the

23

maximum penalties [he] was facing." (*Id.*) In the court's view, Edouard's "hindsight [was] twenty-twenty, and he [was] now regretting his decision to decline the state's 15-year offer." (*Id.* at 4.)

This ruling was reasonable. "Where the [petitioner] argues that his lawyer's unprofessional conduct during the plea stage prejudiced him, [he] must show that there is a reasonable probability that, but for counsel's errors, he would have pleaded guilty and would not have insisted on going to trial." *Rosin v. United States*, 786 F.3d 873, 877 (11th Cir. 2015). In other words, the petitioner must show that "ineffective assistance of counsel . . . caused the rejection of a plea leading to a trial and a more severe sentence." *Lafler v. Cooper*, 566 U.S. 156, 170 (2012). "Applying AEDPA to *Strickland*'s prejudice standard, [I] must decide whether the state court's conclusion that [counsel's] performance . . . didn't prejudice [Edouard] . . . was so obviously wrong that its error lies beyond any possibility for fairminded disagreement." *Mungin v. Sec'y, Fla. Dep't of Corr.*, 89 F.4th 1308, 1317 (11th Cir. 2024).

Edouard cannot meet this demanding standard. As noted above, the court credited counsel's version of events over Edouard's, including the timeline of when certain sentencing estimates were made. (Doc. 12-2, Ex.

24

37, at 3.) "Determining the credibility of witnesses is the province and function of the state courts, not a federal court engaging in habeas review." *Consalvo v. Sec'y for Dep't of Corr.*, 664 F.3d 842, 845 (11th Cir. 2011). Edouard has not shown by "clear and convincing evidence" that the court's credibility determination was erroneous. 28 U.S.C. § 2254(e)(1). Thus, he cannot overcome the "presumption of correctness" afforded that determination. *Consalvo*, 664 F.3d at 845.

Based on the court's reasonable determination of the facts, a fairminded jurist could find no prejudice. First, contrary to Edouard's allegation, counsel informed him that he faced a "[p]otential life" sentence if he rejected the 15-year offer. (Doc. 12-2, Ex. 35, at 35–36, 38.) Second, counsel did not discuss the lowest permissible sentence or a potential downward departure until *after* trial. (*Id.* at 47.) By that time, of course, Edouard had already rejected the offer. Thus, he cannot show that counsel's alleged misadvice "caused the rejection of [the] plea." *Lafler*, 566 U.S. at 170; *see also United States v. Cordova*, 350 F. App'x 285, 290 (10th Cir. 2009) (holding that "failure to inform [defendant] of the statutory maximum penalty could not have influenced [his] rejection of the 14-year offer as that failure occurred *after* [he] had already rejected

the offer"); *Sararo v. United States*, No. 2:15-cv-714-JES-MRM, 2019 WL
1470199, at *9 (M.D. Fla. Apr. 3, 2019) ("[S]ince [petitioner] had already
rejected the government's offer, [counsel's alleged misadvice] had no
impact on [his] decision to reject the three-year plea offer.").

Third, Edouard told the judge before sentencing that he
"consider[ed] [himself] innocent," which was "the main reason why [he]
refused to accept an offer." (Doc. 12-2, Ex. 35, at 14.) Edouard repeated
his assertion of innocence at sentencing, claiming that he "didn't go [to
Harrell's] house with [the] intention of robbing anyone" and that "none
of us had any guns." (*Id.*, Ex. 10, at 17.) Edouard's "claim that he would
have pled guilty had he been properly informed is . . . undermined by his
repeated claims of innocence." *Osley v. United States*, 751 F.3d 1214, 1224
(11th Cir. 2014); *see also Polshyn v. United States*, No. 20-11844, 2021
WL 5904089, at *2 (11th Cir. Dec. 14, 2021) ("Although not dispositive, .
. . a defendant's denial of guilt is a pertinent factor to consider in
determining whether a defendant would have accepted a plea offer.").

## D. Ground Four—Failure to Request Independent Act Instruction

Edouard faults trial counsel for not requesting an "independent act"
jury instruction. (Doc. 1 at 6.) The independent act doctrine applies

26

"when one cofelon, who previously participated in a common plan, does not participate in acts committed by his cofelon, which fall outside of, and are foreign to, the common design of the original collaboration." *Ray v. State*, 755 So. 2d 604, 609 (Fla. 2000). "Under these limited circumstances, a defendant whose cofelon exceeds the scope of the original plan is exonerated from any punishment imposed as a result of the independent act." *Id.* According to Edouard, the original plan was to buy drugs from Harrell, and Curry exceeded the scope of that plan by "tussl[ing]" with Harrell. (Doc. 1 at 6.) Edouard says that, because he had "no involvement in the altercation," he was entitled to an independent act instruction. (*Id.*)

The postconviction court rejected this claim. (Doc. 12-2, Ex. 34, at 4–6.) Citing Florida law, it explained that "[a] defendant is entitled to have [his] jury instructed on the law applicable to [his] theory of the defense if there is any evidence to support the instruction, but such an instruction is not necessary where there is no evidence to support it." (*Id.* at 4.) According to the court, "there was no evidence presented at trial that [Edouard's] common plan was that he was only accompanying the co-felons to participate in a drug deal." (*Id.* at 5.) Instead, "the evidence

presented at trial revealed that [Edouard] was wearing gloves and a hooded sweatshirt on a hot Florida August night"—conduct inconsistent with a mere drug deal. (*Id.*) Thus, "[h]aving reviewed the entire trial transcript," the court held that counsel was not deficient because "there was no evidentiary support for" an independent act instruction. (*Id.*)

The rejection of this claim was reasonable. "[A]lthough the issue of ineffective assistance . . . is one of constitutional dimension," a federal court "must defer to the state's construction of its own law when the validity of the [ineffective assistance] claim . . . turns on state law." *Pinkney v. Sec'y, DOC*, 876 F.3d 1290, 1295 (11th Cir. 2017). Such deference is required here. The postconviction court held that, as a matter of Florida law, "there was no evidentiary support for" an independent act instruction. (Doc. 12-2, Ex. 34, at 5.) Thus, the postconviction court "already has told us how the issue[] would have been resolved under Florida state law had [counsel] done what [Edouard] argues he should have done." *Herring v. Sec'y. Dep't of Corr.*, 397 F.3d 1338, 1354–55 (11th Cir. 2005). That determination is binding on federal habeas review. *See Sabillo v. Sec'y, Dep't of Corr.*, 355 F. App'x 346, 349 (11th Cir. 2009) ("The state courts concluded that [petitioner] was not

28

entitled to an instruction about third degree murder based on the
evidence at trial, and we defer to that conclusion."); *Coldiron v. Jones*,
No. 3:14-cv-181-LC-CJK, 2016 WL 7031973, at *22 (N.D. Fla. Aug. 30,
2016) ("The state courts concluded, as a matter of state law, that
petitioner was not entitled to an instruction about independent act based
on Florida precedent, and this court defers to that conclusion."), *adopted
by* 2016 WL 7031292 (N.D. Fla. Nov. 30, 2016).[5]

Because the postconviction court "authoritatively decided as a
matter of [Florida] law" that Edouard was not entitled to an independent
act instruction, the remainder of the analysis is straightforward.
*Calhoun v. Warden, Baldwin State Prison*, 92 F.4th 1338, 1351 (11th Cir.

---

[5] *See also Young v. Florida*, No. 20-cv-61074-RAR, 2022 WL 2834668, at *9
(S.D. Fla. July 20, 2022) (rejecting ineffective assistance claim because "[t]he
state court concluded that the independent act doctrine did not apply under
state law, and this Court cannot second-guess that dispositive legal
conclusion"), *aff'd*, No. 22-13319, 2024 WL 3964936 (11th Cir. Aug. 28, 2024);
*Milton v. Inch*, No. 4:18-cv-581-RH-MJF, 2020 WL 3230278, at *12 (N.D. Fla.
May 20, 2020) ("This court . . . defers to the state court's state-law conclusion
that [petitioner] did not qualify for an instruction on Florida's independent act
defense."), *adopted by* 2020 WL 3213377 (N.D. Fla. June 12, 2020); *Melton v.
McDonough*, No. 3:06-cv-545-MCR-EMT, 2007 WL 2904133, at *15 (N.D. Fla.
Oct. 4, 2007) ("This court must accord deference to the state court's decision
to the extent it decides the validity of Petitioner's underlying state law claim, that
is, whether he was entitled to an 'independent act' instruction, while reserving
for federal habeas review the ultimate issue of whether the state court's
decision on the ineffective assistance of counsel claim was unreasonable.").

2024). "A lawyer cannot be deficient for failing to raise a meritless claim."

*Freeman v. Atty. Gen.*, 536 F.3d 1225, 1233 (11th Cir. 2008). Therefore,

the postconviction court reasonably concluded that counsel was not

ineffective for failing to request an independent act instruction.

### E. Ground Five—Advising Edouard Not to Testify

Edouard argues that trial counsel was ineffective for advising him

that he "did not need to testify" at trial. (Doc. 1 at 7.) According to

Edouard, he could have testified that he and Curry "went to buy drugs

and a fight broke out." (*Id.*) This testimony allegedly "would have

change[d] the outcome of trial." (*Id.*)

At the evidentiary hearing, Edouard claimed that he talked to

counsel before trial about the possibility of testifying. (Doc. 12-2, Ex. 35,

at 9.) Edouard allegedly told counsel that he was "more than willing to

testify" because it was his "word against" Harrell's. (*Id.*) Edouard claimed

that counsel "[went] over" a list of questions with him. (*Id.* at 28.) At trial,

however, counsel allegedly told Edouard that he "didn't need" to testify

because there "was no way that the jury's going to believe [] Harrell"

given Harrell's performance on cross-examination. (*Id.* at 10.) Based on

this alleged advice, Edouard elected not to testify. (*Id.*) Edouard

proceeded to describe the testimony he would have given at trial but for
counsel's alleged misadvice. (*Id.* at 10–13.)

Counsel gave a different version of events. He testified that, before
trial, he and his associate did a "dry run" of Edouard's testimony at the
county jail. (*Id.* at 37–38.) The associate "did the direct" while counsel
"did the cross." (*Id.* at 37.) Counsel claimed that Edouard performed
"[v]ery badly" during the mock examination. (*Id.* at 38.) He was
"deliberately evasive" and "didn't have answers to obvious . . . questions."
(*Id.*) Moreover, Edouard "sort of crumbled on . . . cross-examination." (*Id.*)
Based on this performance, counsel "felt [Edouard] would not have been
a good witness[;] he would have appeared evasive and not necessarily
forthcoming to a jury." (*Id.*) Counsel told Edouard this, and Edouard
decided before trial that he would not testify. (*Id.* at 39.) Furthermore,
counsel denied telling Edouard during trial that "this is in the bag, you
don't need to testify [because] Harrell did so poorly." (*Id.* at 40.)

The postconviction court rejected this claim, holding that counsel
fulfilled his duty to advise Edouard of the "strategic implications of"
testifying at trial. (*Id.*, Ex. 37, at 5 (citation omitted).) The court found it
"clear" that counsel "had discussions with [Edouard] regarding his right

31

to testify." (*Id.* at 5–6.) Moreover, based on Edouard's performance at the evidentiary hearing, the court agreed with counsel's "assessment that [Edouard's] testimony would not have been beneficial at trial." (*Id.*) The court "found [Edouard's] evidentiary hearing testimony to be evasive, in that his responses avoided directly answering the state's cross-examination questions, and internally inconsistent." (*Id.*) For example, Edouard "testified on direct examination that he did not know he was shot until he stopped at a nearby house and a female therein told him that he was bleeding, but on cross-examination, [he] testified that he went into the nearby house and stated, 'I think I've been shot,' whereupon a female confirmed that he was bleeding." (*Id.*) Because Edouard's "proposed testimony and explanations" were "unreliable[] at best," the court held that counsel was not deficient in advising his client against testifying at trial. (*Id.* at 5–6.)

This ruling was not "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Richter*, 562 U.S. at 103. A strategic decision by counsel "will be held to have been ineffective assistance only if it was so patently unreasonable that no competent

attorney would have chosen it." *Dingle v. Sec'y for Dep't of Corr.*, 480 F.3d 1092, 1099 (11th Cir. 2007). "Because *Strickland* allows for a range of strategic choices by trial counsel, so too is there considerable leeway for state courts to determine the reasonableness of those choices." *Franks v. GDCP Warden*, 975 F.3d 1165, 1176 (11th Cir. 2020). Therefore, to prevail on his ineffective assistance claim, Edouard "would have to show that no reasonable jurist could find that his counsel's performance fell within the wide range of reasonable professional conduct." *Id.*

Edouard cannot make this showing. Before trial, counsel and his associate conducted a practice direct and cross-examination with Edouard. (Doc. 12-2, Ex. 35, at 37–38.) Edouard performed "[v]ery badly"; he was "deliberately evasive" and "sort of crumbled on . . . cross-examination." (*Id.* at 38.) After the "dry run," counsel advised Edouard that he "would not [be] a good witness." (*Id.* at 38–39.) Counsel's concerns proved well-founded. As the postconviction court explained, Edouard was "evasive" at the evidentiary hearing, offering "internally inconsistent" testimony about the shooting. (*Id.*, Ex. 37, at 5.) In these circumstances, a reasonable jurist could conclude that "competent counsel" would advise Edouard against testifying. *Chandler v. United States*, 218 F.3d 1305,

1315 (11th Cir. 2000); *see also Morales v. Sec'y, Dep't of Corr.*, No. 8:21-cv-1846-MSS-TGW, 2024 WL 3540328, at *23 (M.D. Fla. July 25, 2024) (because petitioner "behaved poorly" during "mock examination," state court reasonably concluded that counsel was not deficient for advising him against testifying at trial). Likewise, a reasonable jurist could credit counsel's statement that he did not tell Edouard during trial that "you don't need to testify [because] Harrell did so poorly." (Doc. 12-2, Ex. 35, at 40.) Thus, Edouard cannot show that there was no "reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Richter*, 562 U.S. at 105.

## F. Ground Six—Failure to Object During Closing Argument

Edouard contends that trial counsel should have objected to allegedly improper prosecutorial comments during closing argument. (Doc. 1 at 8.) According to Edouard, the prosecution "shifted the burden [of proof] to the defense" and impermissibly commented on his right to remain silent. (*Id.*) The postconviction court held that counsel was not deficient for failing to object. (Doc. 12-2, Ex. 34, at 8–10.) According to the court, the prosecution neither "shift[ed] the burden onto the defense" nor

34

offered impermissible comments on Edouard's right to remain silent. (*Id.*) This ruling was reasonable.

First, a fairminded jurist could conclude that the prosecution did not shift the burden of proof. "[P]rosecutors must refrain from making burden-shifting arguments which suggest that the defendant has an obligation to produce any evidence or to prove innocence." *United States v. Simon*, 964 F.2d 1082, 1086 (11th Cir. 1992). That said, a prosecutor may comment "on the failure by defense counsel, as opposed to the defendant, to counter or explain evidence." *United States v. Hernandez*, 145 F.3d 1433, 1439 (11th Cir. 1998); *see also United States v. Hano*, 922 F.3d 1272, 1295-96 (11th Cir. 2019) (same).

To support his burden-shifting argument, Edouard cites the following remarks:

> I challenge the defense to come up with a straight face and tell you what innocent reason there is to be wearing those items [i.e., a hoodie, a mask, and gloves] on August 5th.
>
> . . .
>
> Ladies and Gentlemen, the evidence is clear, it all points unmistakably to this man and his companions, that they set out to do a robbery. There is no mistaking it. There is no innocent explanation for that physical evidence, for that mask, for that hoodie, for those gloves, there is no innocent explanation. There's no innocent explanation for lying to the

35

police. It all adds up to one thing, and it's exactly what Robert
Harrell told you.

. . .

And he still never addresses why is he wearing a hoodie then,
why, August, why. Never addressed it. Because it can't be
refuted, Ladies and Gentlemen.

(Doc. 12-2, Ex. 7, at 670, 740, 745.)

These remarks were permissible because they merely highlighted
"the failure by defense counsel, as opposed to [Edouard], to counter or
explain evidence." *Hernandez*, 145 F.3d at 1439. The prosecution argued
that the "defense"—not Edouard himself—could not provide an "innocent
reason" for Edouard's decision to wear a hoodie, a mask, and gloves on a
summer day in Florida. (Doc. 12-2, Ex. 7, at 670.) Likewise, the
prosecution claimed that "[t]here [was] no innocent explanation" for his
outfit or his lies to the police in the hospital. (*Id.* at 745.) Nothing about
these comments suggested that Edouard himself was obligated to prove
anything.

In the final remark, the prosecution said, "And he still never
addresses why is he wearing a hoodie then, why, August, why." (*Id.*
at 740.) A reasonable jurist could conclude that, in context, the
prosecution was referring to *counsel's* failure to "address[]" the hoodie.

(*Id.*) The prosecution made this remark during its rebuttal closing argument. It naturally focused on the arguments counsel advanced in his closing remarks. Immediately before the challenged statement, the prosecution attacked counsel's argument that Edouard wore gloves to avoid leaving fingerprints on marijuana baggies: "Mr. Fielding [defense counsel] said he [Edouard] handled drugs, handled bags, you're going to put on mittens. . . . Do you really think that's a good fair honest explanation for this evidence?" (*Id.*) In the next sentence, the prosecution made the challenged remark: "And he still never addresses . . . ." (*Id.*) In these circumstances, a reasonable jurist could conclude that the remark was permissible because "he" referred to counsel, not Edouard.

Second, a reasonable jurist could find that the prosecution did not impermissibly comment on Edouard's right to remain silent. The prosecution may not "comment[] on a defendant's silence after he has been advised of his *Miranda*[6] rights by a law enforcement officer." *Branch v. Sec'y, Fla. Dep't of Corr.*, 638 F.3d 1353, 1354 (11th Cir. 2011). This rule "is based on the unfairness of an agent of the state advising the defendant that he has the right to remain silent and the state then using

---

[6] *Miranda v. Arizona*, 384 U.S. 436 (1966).

the defendant's post-advice, pre-trial silence against the defendant." *Id.* But the rule "does not apply, and a defendant's constitutional rights are not violated, when a prosecutor comments on the pre-trial silence of a defendant *before* he was advised of his *Miranda* rights by a law enforcement officer." *Id.* (emphasis added).

Here, the prosecution commented on Edouard's silence during his interview with law enforcement in the hospital. (Doc. 12-2, Ex. 7, at 683–84, 686, 744–45.) For example, the prosecution pointed out that Edouard declined to "give any description" of the shooter to the detectives who visited him. (*Id.* at 683–84.) Crucially, however, Edouard was not under arrest during the interview, nor had the police read him his *Miranda* rights. (*Id.*, Ex. 8, at 3.) Indeed, counsel conceded during a sidebar that Edouard "was not under arrest [in the hospital], he was not in custody, he was not warned of his rights. As a matter of fact, he wasn't even considered a suspect, he was considered a victim at that point." (*Id.*, Ex. 7, at 601.) Thus, the prosecution "could comment on [Edouard's] silence" in the hospital because he "had not yet been given [his] *Miranda* warnings." *United States v. Rivera*, 944 F.2d 1563, 1568 (11th Cir. 1991); *see also United States v. Powell*, No. 20-10941, 2021 WL 3878639, at *3

38

(11th Cir. Aug. 31, 2021) (comments on pre-*Miranda* silence "are expressly permitted" under "current law").

In sum, a reasonable jurist could conclude that counsel had no basis to object to any of the challenged remarks. "Failing to make a meritless objection does not constitute deficient performance." *Denson v. United States*, 804 F.3d 1339, 1342 (11th Cir. 2015). Therefore, the postconviction court reasonably found that counsel was not ineffective.

### G. Ground Seven—Alleged Scoresheet Error

Edouard contends that the trial court erroneously added 240 "victim injury points" to his sentencing scoresheet. (Doc. 1 at 9.) According to Edouard, the Florida legislature "did not intend for defendants to be scored 240 victim injury points for second-degree felony murder." (Doc. 12-2, Ex. 21, at 2.) The "correct" calculation would have included only 120 victim injury points, allegedly leading to a "lesser sentence." (Doc. 1 at 9.) Edouard argues—without explanation—that the alleged miscalculation violated his right to "due process of law." (*Id.*)

This claim is not cognizable on federal habeas review because it rests on an alleged misapplication of Florida law. "[S]tate courts are the final arbiters of state law, and federal habeas courts should not second-

guess them on such matters." *Herring*, 397 F.3d at 1355. Thus, "a habeas petition grounded on issues of state law provides no basis for habeas relief." *Branan v. Booth*, 861 F.2d 1507, 1508 (11th Cir. 1988). "In the area of state sentencing guidelines in particular, [the Eleventh Circuit] consistently ha[s] held that federal courts cannot review a state's alleged failure to adhere to its own sentencing procedures." *Id.* (collecting cases). "This limitation on federal habeas review is of equal force when a petition, which actually involves state law issues, is couched in terms of equal protection and due process." *Id.*

Edouard couches his claim in terms of due process, but it "actually involves" the application of Florida sentencing law. *Id.*; *see also Block v. Sec'y, Dep't of Corr.*, No. 8:15-cv-2442-CEH-JSS, 2019 WL 700113, at *6 (M.D. Fla. Feb. 20, 2019) ("Petitioner's state law claim that the sentencing court improperly included 120 victim injury points raises no basis for federal habeas relief."). Indeed, analysis of Edouard's claim would require "an examination of Florida case law and of the Florida Rules of Criminal Procedure." *Branan*, 861 F.2d at 1508. A federal habeas court "cannot" do that. *Id.*

40

Even if the claim were cognizable, Edouard would not be entitled to relief. He raised his argument in state court by filing a motion to correct sentencing error under Rule 3.800(a). (Doc. 12-2, Ex. 21.) Under Florida law, "if the trial court could have imposed the same sentence using a correct scoresheet, any error was harmless and the defendant isn't entitled to postconviction relief." *Zeno v. State*, 330 So. 3d 1048, 1050 (Fla. 2d DCA 2021). The court in Edouard's case held that, "[e]ven assuming . . . the scoresheet should only reflect 120 points for victim injury, [the Rule] 3.800(a) motion fail[ed] because the [trial court] could have imposed the 25-year prison sentence under a corrected scoresheet." (Doc. 12-2, Ex. 22, at 2.) The reason: Second-degree felony murder has a "statutory maximum" of "life imprisonment," and any "scoresheet error in assigning victim injury points" for that offense would have affected only "the lowest permissible prison sentence," not the statutory maximum. (*Id.*) Edouard does not—and cannot—show that this decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court." 28 U.S.C. § 2254(d)(1).

41

## H. Ground Eight—Failure to Challenge Manslaughter Instructions

Lastly, Edouard faults appellate counsel for not arguing that the jury received an "incomplete" instruction on the lesser-included offense of manslaughter. (Doc. 1 at 10.) According to Edouard, the trial court read the instruction on "manslaughter by culpable negligence" but omitted the instruction on "manslaughter by act."[7] (*Id.*) Had counsel raised this issue on direct appeal, the appellate court allegedly "would have reversed the conviction and remanded for a new trial." (Doc. 12-2, Ex. 26, at 8.)

This argument is meritless. Trial counsel did not object to the manslaughter instruction. (*Id.*, Ex. 7, at 669–72, 673–74.) Thus, the claim for ineffective assistance of *appellate* counsel turns on whether the alleged error was "fundamental" under Florida law. If the alleged error was "not fundamental, then [Edouard's] appellate counsel would have been procedurally barred from raising it on appeal, and so he could not have been ineffective for failing to raise it." *Scott v. Sec'y, Dep't of Corr.*, 857 F. App'x 548, 551 (11th Cir. 2021); *see also State v. Delva*, 575 So. 2d

---

[7] A defendant commits manslaughter by act when he "intentionally commit[s] an act that cause[s] the victim's death." *Reed v. State*, 350 So. 3d 836, 839 (Fla. 1st DCA 2022). He commits manslaughter by culpable negligence when the victim's death "result[s] from [his] culpable negligence." *Id.*

643, 644 (Fla. 1991) ("Instructions . . . are subject to the contemporaneous objection rule, and, absent an objection at trial, can be raised on appeal only if fundamental error occurred.").

The appellate court rejected Edouard's ineffective assistance claim without explanation. (Doc. 12-2, Ex. 27.) Thus, it "implicitly" determined that the manslaughter instruction was not fundamentally erroneous. *See Pinkney*, 876 F.3d at 1297 (holding that, "[b]ecause the Florida Second District Court of Appeal denied [petitioner's] state habeas petition" without explanation, "the Florida court has already determined, albeit implicitly, that the error was not fundamental error"). "[T]he fundamental error question is an issue of state law, and state law is what the state courts say it is." *Id.* at 1299. Therefore, I "must defer to the [state] court's underlying determination[]" that the manslaughter instruction was not fundamentally erroneous. *Id.* at 1297–98. Because the instruction did not constitute fundamental error, "appellate counsel would have been procedurally barred from [challenging it] on appeal." *Scott*, 857 F. App'x at 551. Counsel "will not be held to have performed

deficiently" where, as here, he "fail[s] to perform a futile act, one that would not have gotten his client any relief."[8] *Pinkney*, 876 F.3d at 1297.

## V.    **CERTIFICATE OF APPEALABILITY**

A prisoner seeking a writ of habeas corpus has no absolute entitlement to appeal a district court's denial of his petition. 28 U.S.C. § 2253(c)(1). Instead, a district court or court of appeals must first issue a certificate of appealability (COA). *Id.* "A [COA] may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To obtain a COA, Edouard must show that reasonable jurists would find debatable both the merits of the underlying claims and the procedural issues he seeks to raise. *See Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Edouard has not made the requisite showing. Finally, because Edouard is not entitled to a COA, he is not entitled to appeal in forma pauperis.

---

[8] Deference aside, Edouard cannot show that the manslaughter instruction constituted fundamental error. "[T]he fundamental error test for jury instructions cannot be met where . . . there was no error in the jury instruction for the offense of conviction and there is no claim that the evidence at trial was insufficient to support that conviction." *Knight v. State*, 286 So. 3d 147, 151 (Fla. 2019). Edouard cannot show any error in the instructions for the offenses of conviction—second-degree felony murder and attempted robbery. Nor does he "claim that the evidence at trial was insufficient to support [those] conviction[s]." *Id.* Thus, any omission from the manslaughter instruction was not fundamentally erroneous.

It is therefore **ORDERED** that Edouard's Petition for Writ of

Habeas Corpus, (Doc. 1), is **DENIED**. The **CLERK** is directed to enter

judgment against Edouard and in Respondent's favor and to **CLOSE** this

case.

**ORDERED** in Tampa, Florida, on September 22, 2025.


Kathryn Kimball Mizelle
United States District Judge